UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

KATHLEEN A. WALSH,

    Plaintiff,

v.                                          Case No. 1:17-CV-804

PHILLIPS PET FOOD AND SUPPLIES,    HON. GORDON J. QUIST

    Defendant.
_____/

## OPINION

Plaintiff, Kathleen Walsh, filed a pro se complaint against her former employer, Phillips Pet Food and Supplies, alleging claims of hostile work environment sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964. Walsh also alleged a violation of the Michigan Whistleblower's Protection Act (WPA). Walsh obtained counsel, and the parties engaged in discovery. Phillips thereafter filed a motion for summary judgment, arguing that: (1) Walsh cannot establish a prima facie case of retaliation and cannot show pretext; (2) Walsh's evidence fails to establish a hostile work environment claim; and (3) Walsh's WPA claim is barred by the 90-day statute of limitations. The Court heard oral argument on the motion on December 14, 2018.

For the reasons that follow, the Court will grant Phillips's motion and dismiss Walsh's complaint with prejudice.

### I. FACTS

**A.    Walsh's Employment**

Walsh began her brief tenure at Phillips on September 25, 2015, as a temporary worker employed through Kelly Services, a temporary staffing agency. (ECF No. 17-2 at PageID.104.) On February 1, 2016, Phillips hired Walsh directly as a Sanitation Associate at its Lansing, Michigan

facility. (*Id.* at PageID.105; ECF No. 17-5.) Walsh's employment was at will and was subject to a 90-day probationary period. Dave Dingwell, the General Manager, was Walsh's supervisor, but her day-to-day work activities were directed by lead hourly workers, including Warehouse Coordinator Ted Bratschi and Warehouse Lead Don Vinson. (ECF No. 17-2 at PageID.106–07.) Bratschi and Vinson were not in management and had no authority to make employment decisions. (ECF No. 1-4 at PageID.128.)

Walsh's duties as a Sanitation Associate included vacuuming spills, emptying trash, sorting and segregating pallets, and other tasks as assigned. (ECF No. 17-5.) Walsh was also responsible for cleaning the men's restroom, which at times resulted in embarrassing or uncomfortable situations. Sometimes men went into the bathroom, or were already there, when Walsh was cleaning and would "giggle" or "laugh" and say "I'm okay if you're okay [using the bathroom while Walsh cleaned]," at which point Walsh would just leave. (ECF No. 17-2 at PageID.113.) Men were in the bathroom when Walsh was cleaning at least ten times, but made comments only a couple of times. (*Id.*) When Walsh complained to Bratschi, he told her to put the sign up.[1] (*Id.* at PageID.111.)

**B.    Phillips's Anti-Harassment Policy**

At all relevant times, Phillips had a "Harassment and Discrimination Avoidance Policy," which provided in relevant part:

> Phillips is committed to providing a work environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive, or disruptive, including sexual harassment. Specifically, it is the policy of Phillips to employ, train, compensate, promote, and provide other conditions without discrimination due to race, color, religion, national origin, sex, age, handicap or disability, genetic information, sexual orientation, veteran status or other classification protected by applicable law. Moreover, any form of harassment based

---

[1] Walsh testified in her deposition, and her counsel argued at oral argument, that Walsh could not get the sign as Bratschi suggested because "a lot of times the sign was either in a locked cabinet where I couldn't get the sign or the sign was misplaced." (ECF no. 17-2 at PageID.111.) However, there is no evidence that Walsh tried to address such situations by asking for a key or making sure that the sign was stored in an accessible location.

on race, color, religion, national origin, sex, age, handicap, sexual orientation, veteran status or other classification protected by applicable law, hereinafter "harassment", is discriminatory and unprofessional, and will not be tolerated. Phillips will not tolerate any actions, words, jokes, comments, or other communications (including electronic communications) based on a person's sex, race, color, national origin, age, religion, disability, or any other legally protected characteristic. . . .

. . . .

If you experience or witness sexual or other unlawful harassment and/or discriminatory conduct at work, report it immediately to your supervisor. If your supervisor is unavailable or you believe it would be inappropriate to discuss it with your supervisor, you should immediately contact the Human Resources Department or any other member of management. There will not be punishment or reprisal if you report conduct that may violate this Policy or ask questions or raise concerns about it.

. . . .

Phillips strictly prohibits retaliation against any person for reporting harassment or discrimination or for assisting in an investigation. Prohibited retaliation includes threats, termination, demotion, and suspension, failure to hire or give equal consideration in making employment decisions, adversely affecting working conditions or otherwise denying any employment benefit.

(ECF No. 17-8 at PageID.140–41.)

### C. Conflicts with Other Employees

While employed by Phillips, Walsh had negative interactions with three employees who did not supervise her:

- Kevin Smock. Smock was not Walsh's supervisor, but he often followed her around and criticized her job performance. (ECF No. 17-2 at PageID.107.) Smock commented about Walsh taking breaks and socializing while on the job and told her that she would get fired if she was caught engaging in such behavior. (*Id.* at PageID.108.) According to Walsh, Smock "like[d] to boss people around" and was a "bully[]." (*Id.*)

- Tim Smith. On one occasion, Smith, a co-worker, asked Walsh if he could stay at her place because there was a snow storm and he was having transportation issues. (*Id.* at PageID.111.) Walsh testified that she "got pissy, kind of mad, [and] upset about it, and . . . said . . . 'I'm not here to house Phillips employees.'" (*Id.*) Smith ended up staying at Smock's house that night. In January 2016, Smith sent Walsh

      three text messages that stated, "Call me." (*Id.* at PageID.114; ECF No. 17-9.) Walsh told Smith to stop texting her, and he stopped texting her. (ECF No. 17-2 at PageID.114.)

•     <u>James Crooks</u>. Crooks worked in damaged food. He made Walsh feel uncomfortable in several ways, including tapping her on the back and whispering in her ear. (*Id.* at PageID.112.) In February of 2016, Crooks made a joke about bones, but Walsh did not hear the joke and did not understand it. Crooks told her that he was "just being dirty." (*Id.*) Crooks also got into Walsh's "personal space" and talked close to her. (*Id.* at PageID.114.) Walsh also said that Crooks had "hugged" her on two separate occasions. But during her deposition, Walsh clarified that Crooks did not actually hug her in commonly-accepted sense of the word, but instead put his arm around her shoulder as he stood next to her. Both times Crooks had been criticizing Walsh's job performance. On the first occasion, Crooks put his arm around Walsh after she "got teary" in response to criticism from Crooks. The second time, after Walsh became unhappy with Crooks's criticism, Crooks put his arm around her. (*Id.* at PageID.115; ECF No. 20-4 at PageID.330.) Although Walsh said that Crooks groped her breast during one of the hugs, in her deposition she admitted that it was more of a "brush." (*Id.*)

**D.**     **April 22 Occurrences**

On April 22, 2016—prior to the end of Walsh's 90-day probation—Walsh was drinking an energy drink while cleaning the bathroom and the break room. Smock saw Walsh drinking the energy drink and told her that she was violating company policy and would get fired. On her break, Walsh went to Samantha Helmer, Phillips's Human Resources Generalist, and told Helmer that she was tired of being criticized about her job performance. Walsh complained about Smock's comments and actions toward her, Smith's texts, and Crooks's two asexual hugs (as Walsh described them in her deposition) and a crude joke on one occasion. (*Id.* at PageID.113–14.) Walsh also told Helmer about a female employee, Tarryn Frank, who was stealing dog food from Phillips. (*Id.*) Walsh also told Helmer that Keisha Nelson, a former temporary employee at Phillips, had told Walsh that Crooks "hugged" her as well and that Nelson had complained to Phillips's management. (*Id.* at PageID.111.) However, the facts show that Phillips received no such complaint from Nelson. (ECF No. 17-4 at PageID.128.)

4

Helmer told Walsh that she would investigate Walsh's allegations involving Crooks, as required by Phillips's anti-harassment policy. Helmer also told Walsh that Smock was not her boss and that Walsh could tell Smock to mind his own business if he bothered her again. (ECF No. 17-2 at PageID.115.) Walsh's complaint to Helmer was her first complaint to management about any work issue.

That afternoon, Walsh, on her own initiative, put a note on Smock's locker telling Smock to stop harassing her and that, per Helmer, Smock was not Walsh's boss, and Smock should mind his own business. As Smock was standing by his locker reading Walsh's note, Walsh walked out of the women's bathroom and confronted Smock. Walsh described the confrontation as follows:

> I said, did you get my note: He said, yes, I got your note. I go, oh, and by the way, I'm tired of you harassing me, you're always harassing me and telling me what to drink, how to do my job. I said you're creating this hostile work environment for me and always telling me I'm going to get fired and I was just like, you need to mind your own business and leave me alone and that was it.

(*Id.* at 116.) Walsh raised her voice and "may have" used the vulgarity "shit" toward Smock. (*Id.*) Smock did not engage with Walsh and, instead, turned and walked away. (*Id.* at PageID.117.)

Walsh starting walking toward her jack—a vehicle used to lift heavy loads. As she did so, she saw Crooks and decided to confront him about the alleged hugs. Walsh walked up to Crooks and told him, "stop giving me those creeping, groping hugs just like you did Keisha Nelson . . . you dirty old man." (*Id.*) Walsh claims that Crooks started trembling, his face became "beat red," and he said "what did I ever do to you?" Walsh claims that Crooks then grabbed her arms, stated that he wanted to talk to her, and pulled her about six feet toward some shelving. Walsh claims that she struggled with Crooks and broke free, with assistance from a coworker, Garcia Gamalier. (*Id.*) After breaking free from Crooks, Walsh got on her jack and drove it about a half mile to the warehouse. Walsh claims that she saw Crooks get on a jack and drive toward the warehouse looking

5

for her, but Walsh avoided him. She eventually parked her jack and left work without speaking to Helmer or anyone else in management about the incident. (*Id.* at PageID.118–19.)[2]

### E. The Police are Called

The following morning, Saturday April 23, 2016, Walsh went to Lansing Urgent Care complaining of swelling and bruising on her arm caused by Crooks. The nurse who treated Walsh called the Michigan State Police, and an officer interviewed Walsh that afternoon. Walsh did not report the injury or her contact with the police to anyone at Phillips. (ECF No. 17-2 at PageID.119.)

The following Monday, April 25, 2016, a police officer went to Phillips' facility to conduct an investigation. The police did not speak with Walsh but did interview several witnesses. (ECF No. 17-12.) At the conclusion of the interviews, the officer advised Helmer that he had been unable to find any evidence to support Walsh's claim. (ECF No. 17-4 at PageID.130.)

### F. Helmer's Investigation and Walsh's Termination

Helmer began her own investigation on April 25, after the police investigation had concluded. Helmer took a statement from Crooks that day and a statement from Walsh the following day. Helmer also took statements from the same employees the police had interviewed. (ECF No. 17-13.) After completing her investigation, Helmer was unable to substantiate Walsh's version of events. (ECF No. 17-4 at PageID.129.)

On April 28, 2016, Helmer notified Walsh that Phillips was terminating her employment. (ECF No. 17-2 at PageID.123.) In her letter (which followed up on a phone call), Helmer cited the disruption that Walsh caused on April 22 and her unprofessional conduct, as well as Walsh's unsubstantiated accusation of harassment against Crooks. Helmer wrote that "Phillips takes our

---

[2]Walsh testified that there were 40-50 people "around us in a big group coming from the break room" and identified about 5 people who were in the vicinity of the incident with Crooks, but none of them reported seeing anything. Walsh's counsel also deposed two people whom Walsh identified as witnesses—Sinay Blanco and Gamalier Garcia—but both denied seeing or being involved in the alleged altercation. (ECF Nos. 17-10, 17-11.)

Harassment Policy very seriously and engaging in bad faith complaints is a direct violation of our conduct policy."[3]  (ECF No. 17-14.)

## II. DISCUSSION

The Court's initial task is to identify the claims at issue.[4]  Walsh concedes that her WPA claim is untimely and, therefore, should be dismissed. (ECF No. 18 at PageID.196–97.) In addition, in her response, Walsh failed to address with evidence, argument, or law, a disparate treatment sex discrimination claim.  Sixth Circuit jurisprudence holds that under such circumstances, Walsh is deemed to have abandoned her sex discrimination claim. *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").  Accordingly, the Court addresses the only two contested claims—sexual harassment and retaliation.

### A.  Sexually Hostile Work Environment

To state a claim for hostile work environment discrimination under Title VII, a plaintiff must allege that:  (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment created a hostile work environment; and (5) the employer is liable. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).  "To establish employer liability where the harasser is a co-worker, a plaintiff must show that the employer knew or should have known of the conduct and failed to take prompt and appropriate corrective action." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016) (citing *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 298, 518 (6th Cir. 2001)).

---

[3]Walsh filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on February 22, 2017.  The EEOC found no basis to find a violation.  (ECF No. 18-6.)

[4]Walsh's counsel did not amend Walsh's pro se complaint after he appeared in the case, but with counsel's aid, the Court can discern the claims.

7

Phillips argues that Walsh cannot establish the third, fourth, and fifth elements of the claim. The Court agrees.

### *Harassment Based on Sex*

Title VII prohibits discrimination in employment based on an "individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Harassment based on sex that creates a hostile work environment is prohibited by Title VII. *See Meritor Sav. Bank. FSB v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399, 2404 (1986). Before a court inquires "as to whether the degree of 'harassment' was sufficient to violate Title VII, it is important to determine whether there was any discriminatory 'harassment' in the first place." *Schramm v. Slater*, 105 F. App'x 34, 39 (6th Cir. 2004). The Supreme Court has noted that "Title VII does not prohibit all verbal or physical harassment in the workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 1002 (1998). Rather, Title VII pertains only to harassment based on a protected status, such as sex or race. *Id.* Thus, "the conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's [protected status]." *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 467 (6th Cir. 2012).

In her response, Walsh identifies three bases for her hostile work environment claim:

- the ten or so incidents when men were using or entered the bathroom while she was cleaning;

- the one occasion on which Smith asked Walsh if he could stay at her place;

- the two occasions Crooks put his arm around Walsh when she became emotional, which Walsh described as "hugs"; and

- the one instance that Crooks made a potentially inappropriate joke, which Walsh did not hear.

8

(ECF No. 18 at PageID.185–86.)[5] The Sixth Circuit has observed that "the conduct underlying a sexual harassment claim need not be overtly sexual in nature. *Any* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive . . . , constitute a hostile environment in violation of Title VII." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (italics in original).

As for the bathroom incidents, Walsh fails to show that they were based on sex. Cleaning the bathroom was one of Walsh's duties as a Sanitation Associate. She thus was not asked to perform this duty because she was a woman. In addition, there is no indication that the incidents in which she found men using the bathroom while she was cleaning occurred because of her sex. Walsh admitted that men asked her if she was okay if they used the bathroom, and Walsh had the option of leaving while they did so. Moreover, Walsh admitted that these incidents happened after she did not post signage or failed to announce her presence. Finally, Walsh offers no evidence that such incidents (men wanting to use the bathroom when it was being cleaned) would not have also occurred to a male cleaning the bathroom.

Next, there is no evidence that the Tim Smith incident (asking Walsh to stay at her place one night) occurred because Walsh was a woman. Walsh testified that Smith asked to stay at her place because it was during a snow storm and Smith was without transportation. In fact, Walsh admitted that Smith ended up staying with Smock. (ECF No. 17-2 at PageID.112.)

---

[5]In its reply, Phillips argues that Walsh may not rely on the bathroom incidents or the Tim Smith incident because Walsh failed to raise them in her EEOC charge and all of the incidents, including the Crooks incidents, were outside of the 300-day window for filing an EEOC charge set forth in 42 U.S.C. § 2000e-5(e)(1). Whether the bathroom incidents and the Tim Smith incident should be considered beyond the scope of Walsh's EEOC charge is arguable, but there is no question that *all of the incidents giving rise to Walsh's hostile work environment claim* occurred more than 300 days before Walsh filed her EEOC charge. *See National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 117–18, 122 S. Ct. 2061, 2075 (2002) (holding that when a plaintiff alleges a hostile work environment claim, so long as one act alleged to be part of the hostile work environment occurs within the 300-day period, the plaintiff may rely on events that occurred outside of that period). Regardless, because Phillips did not raise untimeliness until it filed its reply, the Court deems the issue waived. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

Finally, as to the Crooks incidents, Phillips argues that Walsh fails to present any evidence (indeed, she does not even argue), that Crooks hugged (or more accurately, put his arm around) Walsh on the two occasions because of Walsh's sex. As Phillips notes, Walsh admitted that Crooks put his arm around her because Walsh became upset and "teary" when Crooks criticized her job performance. Regardless, even if Crooks acted because of Walsh's sex, as discussed below, Walsh's claim fails because it was not severe or pervasive.

### *Hostile Environment*

A hostile environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (internal quotation marks and citation omitted). In *Harris*, the Court observed:

> mere utterance of an . . . epithet which engenders offensive feelings in a employee does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Id.* at 21-22, 114 S. Ct. at 370 (internal citations omitted). A court must consider the totality of the circumstances in determining whether an environment is "hostile" or "abusive," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S. Ct. at 371. "A mere unfriendly work environment is insufficient to establish liability." *Mast v. IMCO Recycling of Ohio, Inc.*, 58 F. App'x 116, 118 (6th Cir. 2003). In other words, Title VII is not "a general civility code." *Oncale*, 523 U.S. at 81, 118 S. Ct. at 1002.

The conduct Walsh cites to support her claim does not meet this requirement. As noted, the only conduct that was even arguably sexual in nature were Crook's putting his arm around her, twice, and one joke that Walsh admits she did not hear. But even if the Court considered all of the conduct Walsh alleges, it would not rise to the level of a hostile or abusive environment. Phillips cites a number of cases in both its opening and reply briefs in which the Sixth Circuit held that the plaintiff failed to establish a sexually hostile environment. *See Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 344 (6th Cir. 2005) (plaintiff's co-workers vulgar jokes, placing a vibrating pager on the plaintiff's thigh, and pulling at the plaintiff's overalls after she told him she was wearing a thong did not constitute conduct pervasive enough to alter the conditions of the plaintiff's employment); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (several incidents of harassment, including shoulder rubbing, grabbing of buttocks, and suggestive comments, were not severe or pervasive). As these more egregious cases show, Crooks's conduct, alone, or even considered together with the other conduct that Walsh cites, was not severe or pervasive enough to constitute a hostile environment.

### *Employer Liability*

An employer is liable for coworker harassment if the employer "knew or should have known of the harassment, yet failed to take prompt and appropriate corrective action." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008). The employer may be held liable if its response "manifests indifference or unreasonableness." *Id.* (internal quotation marks omitted). "Generally, a response is adequate if it is reasonably calculated to end the harassment." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013) (internal quotation marks omitted). Reasonable corrective steps "may include promptly initiating an investigation to determine the factual basis for the complaint, speaking with the specific individuals identified by [the

complainant], following up with [the complainant] regarding whether the harassment was continuing, and reporting the harassment to others in management." *Id.* (internal quotation marks omitted).

The record evidence shows that Walsh first complained about Crooks's conduct on April 22, 2016, when she spoke to Helmer. The same day, Helmer met with Crooks and told him not to hug Walsh again. (ECF No. 17-4 at PageID.128.) Crooks did not hug, *i.e.*, put his arm around, Walsh again. Walsh presents no evidence to show that Helmer failed to take corrective action, that speaking to Crooks was not reasonably calculated to end the alleged harassment, or that Walsh experienced a hug or any sexual harassment after that date.

### B. Retaliation

To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) the employer was aware of the plaintiff's protected activity; (3) she suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 562-63 (6th Cir. 2004). If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *Id.* (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000)). If the defendant meets its burden, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was mere pretext. This entails a showing that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to motivate the adverse action. *Id.* (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

### *Prima Facie Case*

Walsh argues that she engaged in protected activity when she complained about Crooks's conduct to Helmer on April 22, 2016, and when she reported Crooks's conduct to the police the

12

following day.  Phillips does not dispute that Walsh engaged in protected conduct when she made her April 22 complaint to Helmer.  It argues, however, that Walsh may not allege that her report to the police forms a basis of her retaliation claim because she did not mention going to the police in her EEOC Charge, nor did she allege in her complaint in this case that her report to the police was a basis for her retaliation claim.  As Phillips notes, "[a]s a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010).  However, a claim may be considered within the scope of an EEOC charge if "the claim can be reasonably expected to grow out of the EEOC charge." *Strouss v. Mich. Dep't of Corrs.*, 250 F.3d 336, 342 (6th Cir. 2001).  Nonetheless, even if Walsh had mentioned her complaint to the police in her EEOC charge, nothing in the police report indicates that Walsh contacted the police to complain about sexual harassment.  Rather, the police responded to an alleged assault.  (ECF No. 17-12 at PageID.156.)  Thus, Walsh's complaint to the police was not protected conduct. *See Hawkins v. Miller*, No. 3:07-CV-383-H, 2007 WL 2400975, at *4 (W.D. Ky. Nov. 13, 2007) (holding that the plaintiff did not engage in protected conduct when he called the police because nothing in the complaint or exhibits indicated that he reported any discriminatory treatment to the police).

  Although Walsh's complaint to Helmer was considered protected activity, Phillips argues that Walsh fails to establish a prima facie case because she cannot show a causal connection between her protected activity and her termination.  Phillips notes that Walsh's conduct during the afternoon of April 22—after Walsh complained to Helmer—which formed, in part, the basis for the subsequent termination, precludes any causal connection.  Walsh essentially relies on temporal proximity to establish a causal connection.  The Sixth Circuit has held that temporal proximity, without other evidence of retaliatory conduct, is generally insufficient to establish the required causal connection for a retaliation claim. *See Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321

(6th Cir. 2007). On the other hand, the Sixth Circuit has also recognized that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."[6] *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Here, Walsh complained to Helmer on April 22, 2016, and Phillips terminated Walsh only six days later, on April 28, 2016. Under these circumstances, the Court concludes that Walsh has establish the required causal connection solely through evidence of temporal proximity. *See McNett v. Hardin Cmty. Fed. Credit Union*, 118 F. App'x 960, 965 (6th Cir. 2004) (temporal proximity alone established causal connection where the plaintiff was terminated "only 13 days" after the plaintiff engaged in protected conduct).

### *Pretext*

Even though Walsh has established a prima facie case, she must still show that Phillips's legitimate reason for terminating her employment was pretext. Phillips has presented evidence that it terminated Walsh for engaging in disruptive behavior toward Smock and because it concluded that her allegation about Crooks assaulting her was false.[7]

Walsh argues that Phillips's reasons for terminating her are pretext for two reasons. First, as for engaging in unprofessional conduct toward Smock, Walsh argues that Phillips had no evidence that Walsh swore at Smock. Even absent such evidence, Walsh's admitted

---

[6]At the same time, engaging in protected conduct does not immunize an employee from termination where adequate grounds for termination exist. *Russell v. Ohio, Dep't of Admin. Servs.*, 302 F. App'x 386, 394 (6th Cir. 2008)

[7]Whether Helmer correctly concluded that Walsh's version of the Crooks incident was false is not germane to the pretext inquiry. Under the Sixth Circuit's "honest belief rule," "so long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). To benefit from the rule, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.* at 807. The employer's "decisional process . . . [need not] be optimal," and the employer need not show "that it left no stone unturned." *Id.* Here, Phillips has shown that Helmer reasonably relied on employees' reports concerning the Smock incident and the Crooks incident.

conduct—raising her voice toward Smock and creating a disturbance in the workplace—was unprofessional, in violation of Phillips's work rules. Moreover, Walsh admitted in her deposition that she may have said "shit" toward Smock. (ECF No. 17-2 at PageID.116.) In addition, employee Blaine Guest said in his statement to the police that he heard Walsh yell to Smock, "Did you read my fucking note?" (ECF No. 17-12 at PageID.154.) Helmer sat in on the police interviews of the witnesses, including Guest, and heard what they had to say. (ECF No. 20-6 at PageID.344.) Thus, although not necessary to the termination decision for creating a disruption in the workplace, Helmer also had reason to believe that Walsh swore at Smock. Finally, apart from the interaction with Smock, calling a fellow employee a "dirty old man," as Walsh admits having called Crooks, is bound to cause unnecessary disruption in the workplace.

Walsh further argues that it is disingenuous for Phillips to claim that it terminated Walsh for confronting Smock because Helmer encouraged Walsh to tell Smock not to boss her around. However, when asked why she went up to Smock and "talk[ed] to him that way," Walsh stated that she felt "it needed to come out" and it was her "way of dealing with a bully." (ECF No. 17-2 at PageID.117.) Thus, Walsh admitted that *she* made the decision to confront Smock.

Finally, Walsh argues that she has demonstrated pretext because Phillips's explanations for discharging her have been inconsistent—vacillating between alleged unprofessional conduct toward Smock and falsely accusing Crooks of assault and battery.[8] In her termination letter to Walsh, Helmer stated: "Our investigation confirmed your actions in the events on Friday, April 22nd, 2016 were a disruption to the workplace and your conduct during these matters was unprofessional. In

---

[8]Walsh suggests in her brief that Helmer's characterization of Walsh's complaint on April 22, 2016, about Crooks's "hugging" conduct as "false" does not render Walsh's complaint unprotected by Title VII. The Court does not interpret Helmer's statements regarding Walsh's "false allegations" as directed at Walsh's April 22, 2016, complaint. The evidence cannot reasonably be interpreted to support such a conclusion. Rather, Helmer was referring to Walsh's complaint to the police about Crooks's alleged assaultive conduct on the afternoon of April 22, which both the police and Helmer investigated and determined, appropriately, to be unfounded.

addition, our investigation revealed that your harassment claim against another employee was unsubstantiated." (ECF No. 17-14 at PageID.167.) While it is true that in Phillips' EEOC submission Helmer stated Walsh was terminated because she falsely accused Crooks of assault and battery, Helmer also mentioned Walsh's disruptive confrontation with Smock. And, while it is true that at different times Helmer has stressed one of those reasons over the other for the termination, Helmer consistently cited both reasons. In short, Helmer cited both reasons from the outset and never wavered from them in explaining the basis for Phillips's termination decision.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Phillips's motion for summary judgment.

An Order consistent with this Opinion will enter.


Dated:  December 20, 2018                              /s/ Gordon J. Quist
                                                    GORDON J. QUIST
                                                 UNITED STATES DISTRICT JUDGE